UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RONALD BISHOP, *on behalf of himself and all others similarly situated,*<br>　　　　　　　　　　Plaintiff,<br><br>　-against-<br><br>INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES LOCAL 52, AMAZON MGM STUDIOS, LLC, CBS STUDIOS, INC., MARVEL STUDIOS LLC, UNIVERSAL TELEVISION, LLC, NETFLIX PRODUCTIONS, LLC, SONY PICTURES TELEVISION, LLC, APPLE STUDIOS, INC., HBO STUDIOS, INC.,<br>　　　　　　　　　　Defendants. | Civil Action No.:<br><br>**<u>COMPLAINT</u>** |

Plaintiff Ronald Bishop ("Bishop" or "Plaintiff") as and for his complaint of discrimination against the above-captioned defendants, alleges as follows:

**PRELIMINARY STATEMENT**

This matter is a class action complaint, pursuant to the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 290 *et seq.* the New York City Human Rights Law ("NYCHRL") N.Y.C. Admin. Code § 8-101 *et seq.,* and the Labor Management Relations Act ("LMRA") 29 U.S.C. 185(a) for discrimination and breach of contract against the producers of and labor organization for many of the entertainment industry's most popular and high-profile film and television productions for systemic racial discrimination in hiring and promotion in the film and television production industry. Through this complaint, Mr. Bishop seeks to put a spotlight on his experiences working in this industry, and the general practices that result in the exclusion of qualified African Americans and Latinos from equal job opportunities. In 2012, the Civil Rights Bureau of the New York State Office of the Attorney General ("NYOAG") launched an investigation into the admissions policies of the International Alliance of Theatrical

Stage Employees ("IATSE"), Local 52, Motion Picture Studios Mechanics ("Local 52") after receiving complaints about discrimination against qualified African American and Latino applicants for Local 52 membership. The NYOAG's thorough two-year investigation found that Local 52's admissions policies and practices had a **disparate impact** on qualified African American and Latino applicants, depriving them of an equal opportunity to join this high-paying and desirable field of work. Today, in 2024, many of the same practices and policies found by the NYOAG to deprive African Americans and Latinos of equal job opportunities still exist. The same policies and outright discrimination continue to deprive Mr. Bishop, and all others similarly situated, of millions of dollars in compensation and benefits.

## PARTIES

1. Mr. Bishop is an African/American male and is a resident of Kings County in the State of New York.

2. Defendant International Alliance of Theatrical Stage Employees, Local 52, Motion Picture Studio Mechanics' Union ("Local 52" or "Defendant") is a labor organization and is the largest New York branch of the International Alliance of Theatrical Stage Employees ("IATSE"), the self-styled *Union Behind Entertainment*.

3. Defendant Marvel Studios, LLC is a motion picture production company, and is a division of the Walt Disney Company, Inc.

4. Defendant CBS Studios, Inc. is a motion picture production company, and is a division of Paramount Global, Inc.

1

5. Defendant Netflix Productions, LLC is a motion picture production company, and is a division of Netflix, Inc.

6. Defendant Amazon MGM Studios Inc. is a motion picture production company, and is a division of Amazon.com Inc.

7. Defendant Universal Television, LLC is a motion picture production company, and is a division of NBCUniversal, Inc.

8. Defendant HBO Studios, Inc. Is a motion picture production company, and is a division of Warner Bros. Discovery, Inc.

9. Defendant Sony Pictures Television, Inc. is a motion picture production company, and is a division of Sony Group, Inc.

10. Defendant Apple Studios, Inc. is a motion picture production company, and is a division of Apple, Inc.

11. Defendants named in paragraphs 3-10 (collectively, the "Defendant Studios") are Class "A" members of the Alliance of Motion Picture and Television Producers ("AMPTP").

12. The AMPTP is the film and television industry's trade association that, *inter alia,* negotiates, as the exclusive bargaining agent, on behalf of the film and television producers, the collective bargaining agreements ("CBA") between the producers and the industry's unions that define the relationships between the industry and its workers.

13. AMPTP's Class "A" members, because of their size and influence in the entertainment industry, effectively control the AMPTP, and take the lead in CBA negotiations between the producers and the unions.

14. Local 52 is the exclusive collective bargaining representative for the represented craft employees within its jurisdiction, which covers New York, New Jersey, Connecticut, Delaware and Pennsylvania, excluding Pittsburgh and its surrounding 75-mile radius. Local 52 is divided into departments, or "crafts," by job categories, e.g., electric, property, sound, etc.

15. Mr. Bishop applied to the electric craft.

16. The most recent CBA between the producers and the industry's unions was negotiated and signed in July 2021.

17. That CBA contains a "union security" clause. A union security clause is an agreement between a union and employer, usually in a collective bargaining context, that defines the rights and obligations of employers in relation to workers represented by unions, e.g., whether employees will be compelled to join the union, or whether employers are required to collect union dues from union represented workers.

18. The Local 52 CBA union security agreement requires signatory employers to collect dues from non-union members.

19. The Local 52 CBA union security clause also solidifies Local 52's role as "gatekeeper" to employment in television and film production within its jurisdiction.

20. The Defendant Studios also explicitly recognize Local 52 as the exclusive collective bargaining representative of all Defendant Studio employees in the represented craft departments.

3

21. In order to obtain employment on a Defendant Studio television or film production, a worker must be referred through the Local 52 union hall.

22. In fact, within the past 180 days, Mr. Bishop has applied for employment with the Defendant Studios but has been denied any work.

23. The Defendant Studios' hiring policy has a disparate impact on African American and Latino job applicants.

24. Because of Local 52's racially exclusionary admissions and job referral policies, and the Defendant Studios' active participation, qualified African American and Latino workers are significantly underrepresented in the film and television production jobs in this jurisdiction.

25. Further, the Defendant Studios enjoy generous tax breaks from New York City and New York State to incentivize hiring in the motion picture production industry in the city and state. Therefore, the actions of Local 52 and the Defendant Studios amount to subsidized discrimination in the workplace.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332

27. Plaintiff has filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*

28. Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) as Local 52's principal place of business is located in Queens County and Mr. Bishop is a resident of Kings County, New York.

29. Pursuant to § 8-502(c) of the NYCHRL, Plaintiff will serve a copy of this Complaint on the NYC Commission on Human Rights and the Corporation Counsel of the City of New York.

## RULE 23 CLASS ALLEGATIONS

30. Plaintiff brings claims for relief pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP") on behalf of himself and all other similarly situated African American and Latino applicants for Local 52 membership or jobs with the Defendant Studios ("the "Class") on or after the date that is three years before the filing of the Complaint ("Class Period") in this action.

31. For purposes of notice, the Class members' names and addresses are easily ascertainable from Defendants' records.

32. The proposed Class is sufficiently numerous to make jointer of all parties impracticable, and, upon information and belief, is not less than one hundred (100) individuals.

33. Plaintiff's claims arise out of the same set of Defendants' policies and practices of the Class members.

34. Plaintiffs are able to fairly and adequately represent the interest of all Class members and is represented by counsel experienced in class and collective actions.

## FACTUAL ALLEGATIONS

35. Mr. Bishop first applied to join Local 52 in late 2012. Mr. Bishop failed his first admissions process, which included a written test and practical skills test, to join the union.

5

36. At the time, Local 52 informed Mr. Bishop that he did not yet have the requirements for membership, denied his application and kept his application fee and processing fee.

37. Mr. Bishop was then allowed to work for Local 52 represented productions as an "applicant," a status he would hold for 11 years while attempting to qualify for Local 52 membership, despite the fact that by the union's own constitution, Mr. Bishop should have been granted automatic membership in 2018, after five years of being vested in the union's retirement plan.

Mr. Bishop began his career as an applicant electrical technician on television and film sets with production company Vienna's Dream Productions, Inc. on March 24, 2013, where, on that project, he earned 12.7 production hours.

38. A Motion Picture Industry ("MPI") account that tracks production hours worked on each production is created for each worker, whether or not, they are union members

39. See a true and correct copy of Mr. Bishop's full MPI account hours attached hereto as **Exhibit A.**

40. The number of production hours an applicant, or any other worker, earns on each production is very important because production hours determine vesting status and benefit levels within the union's health, benefits and retirement plans, the Motion Picture Industry Pension and Health Plan ("MPIPHP").

41. Depriving workers of production hours, for any reason, also deprives them of valuable future benefits and retirement compensation.

42. More importantly, vesting into MPIPHP, per the union's constitution, automatically vests an applicant with union membership.

**Local 52 Refuses Mr. Bishop Membership After Vesting**

43. Article 7, Section 21 of I.A.T.S.E. Constitution states: "**Any person who has achieved vested status in a Local or national defined benefit pension plan shall immediately be taken into membership without vote.**"

44. Mr. Bishop vested into the MPIPHP defined benefit pension plan in March 2018. Therefore, at that time, Mr. Bishop should have been immediately taken into the membership, or as colloquially stated, made a "cardholder."

45. Local 52 blatantly ignored its own Constitution and failed to offer Mr. Bishop immediate membership into the union.

46. Incredibly, Mr. Bishop was required to go through several more discriminatory admissions cycles, even after being vested into the MPIPHP.

47. For example, in October 2022, Mr. Bishop was required to take a written exam and a practical skills test in order to qualify for Local 52 membership.

48. On Sunday, January 29, 2023, Mr. Bishop was informed by email from the Local 52 HR Director that he had filled the electric department craft examination, which again denied him membership to the union. The email further stated that Mr. Bishop could apply on the still unscheduled next admission cycle, whenever that would take place.

The email did not state on what basis Mr. Bishop failed the examination. The examination, the written portion and the practical skills portion, are administered by an individual in Local 52's electric department, and not by a neutral party.

49. During this time, Local 52 was fully aware of the vesting provision in the IATSE Constitution but chose to ignore this provision in order to exclude unwanted members.

50. There are no checks and balances to determine whether or not the practical skills portion of the examination is being administered in a consistent and equal basis.

51. In fact, there is reason to believe that the examination gatekeepers were administering the exam on a discriminatory basis, passing those individuals who they favored.

52. Mr. Bishop's applicant status, effectively second-class citizenship, allowed him access to employment through union hall referrals but as explained further below, never on an equal basis with the mostly white cardholding members of Local 52.

53. Over the past three years, Mr. Bishop has worked for Defendant Studios, including but not limited to, CBS Studios, Inc., Netflix Productions, LLC, Universal Television, LLC and Marvel Studios, LLC.

54. Over the past decade, Mr. Bishop gained the experience and skill he allegedly previously lacked, while working on Defendant Studio productions, such as Daredevil and Blue Bloods, however his admission to Local 52 has remained closed.

55. Despite his vast experience, Mr. Bishop is not treated equally with cardholders while working on Defendant Studio productions.

56. For example, as an applicant, Mr. Bishop is restricted from supervisory roles on productions and has looked on while much less experienced White technicians were promoted ahead of him, earning higher pay and status.

57. These restrictions by the Defendant Studios have caused Mr. Bishop financial harm and emotional distress.

58. Local 52's workforce is separated into several different categories, or statuses, correlated to the individual's membership status. At the top of the food chain are the actual members of Local 52 or "cardholders." Next, there are the "applicants," individuals who have applied for Local 52 membership, but, for varying reasons, have been denied membership. The next category of workers is the "permits," individuals who have yet to apply for membership to Local 52 or have refused to apply to the union.

59. Cardholders are Local 52's first class citizens. Many of the advantages, privileges and benefits of being a cardholder, as opposed to the lesser union statuses, blatantly violate unfair labor practices laws pursuant to the National Labor Relations Act ("NLRA").

60. Cardholders are the first hired and last fired on productions and are able to take days off from productions with the right to return to work. Cardholders can bump, or replace, non-cardholders from productions when cardholders are in need of work.

61. Due to Local 52's racially discriminatory admissions policies, cardholders are disproportionately White compared to the labor pool in the metropolitan New York City area.

9

**New York Attorney General Finds Racially Discriminatory Admissions Policies**

62. In August 2012, after receiving complaints, the Office of the Attorney General of the State of New York ("NYOAG"), Civil Rights Bureau, opened an investigation into Local 52's membership admissions policies to determine whether the union discriminated against qualified African American and Latino applicants by failing to provide equal opportunity for admission and employment.

63. The NYOAG's investigation lasted for approximately two years, from August 2012 to September 2014. The NYOAG investigation was thorough: it included reviewing Local 52's internal documents; taking sworn testimony of Local 52 Executive Board members; data analyses; and conducting interviews with complainants.

64. The NYOAG investigation found **significant disparities** between, on the one hand, lack of African American and Latino representation in the union membership, and on the other hand, the representation of these minority groups in the metropolitan area labor pool.

65. The NYOAG investigation concluded that Local 52's discriminatory admissions practices had a **disparate impact** on African American and Latino applicants.

66. The NYOAG also found that union members obtained significantly more film and television jobs, and on a more consistent basis, than applicants.

67. The conditions described above in paragraphs 49 and 50 exist today where African American and Latino representation in the Local 52 membership

ranks remains significantly low compared to these groups' representation in the local labor pool.

68. The NYOAG found several causes for the disparities. The NYOAG found that Local 52's admissions policies relied on nepotism, the inconsistent application of rules to qualify for membership, and the discriminatory content and administration of craft examinations.

69. The NYOAG concluded that, because of the already significant underrepresentation of African Americans and Latinos, Local 52's use of nepotism (favoring family and friends) to admit new members caused these minority groups to be excluded from industry jobs.

70. Each admissions cycle, Local 52 administers examinations, consisting of a written test and a practical skills demonstration, to union membership hopefuls.

71. The subjective nature of the content and administration of the craft examinations, cited by the NYOAG as discriminatory, continues to the present. Applicants with years of experience and training are consistently failed on craft examinations, while friends and family of Local 52 members with much less experience and training are passed or are made members through other means.

Mr. Bishop's applicant status is a perfect example of the union's inequitable application of its membership rules. Mr. Bishop qualified for automatic union membership in March 2018. However, the union did not decide to grant the status, and instead waited six years in 2024 to finally invite him to union membership.

11

On September 24, 2014, Local 52 and the NYOAG entered into a settlement agreement, called an Assurance of Discontinuance ("AOD"), to resolve the NYOAG's potential claims against the union for race discrimination.

72. See a true and correct copy of the AOD attached here to **Exhibit B.**

73. Local 52 agreed to pay a monetary penalty of $475,000 and agreed to an extensive set of structural remedies aimed at ensuring equal opportunity for union membership for all.

74. The structural remedies included changes to Local 52's application procedures that had a disparate impact on African American and Latino applicants.

75. Local 52 agreed to ensure that the design of its application procedures allowed for applicants to be evaluated on their qualifications and abilities in a consistent and non-discriminatory manner that does not favor the family and friends of Local 52 members.

76. On September 6, 2016, the NYOAG and Local 52 signed an Addendum, or extension, to the AOD, which was set to expire on June 20, 2017. See a true and correct copy of the Addendum attached hereto as **Exhibit C.**

77. The Addendum stipulated continued monitoring and structural changes to the union's admissions process in order to ensure equal opportunity for African Americans and Latinos.

78. The fatal flaw of the NYOAG's settlement and extension with Local 52 is that the monitoring and many of the necessary structural changes were temporary and limited in scope. Local 52 has presently reverted to the same old practices that resulted in the investigation in the first place.

79. To this day, Local 52 continues the same policies and practices found by the NYOAG to be discriminatory against African American and Latino applicants.

80. Further, the NYOAG failed to address the role of the employers, including the Defendant Studios, in perpetuating discriminatory policies against African Americans and Latinos.

**Harker NLRB Complaints Against Local 52**

81. On January 10, 2022, James Harker ("Harker"), a Local 52 member, filed with the National Labor Relations Board ("NLRB") a Charge of Unfair Labor Practices ("ULP") against Local 52 alleging, *inter alia,* that the union, and certain film studio employers, that are also AMPTP members and signatories of the Local 52 CBA, discriminated against applicants, as opposed to Local 52 members, in its hiring practices.

82. See a true and correct copy of the Harker ULP Charge attached hereto as **Exhibit D.**

83. The specific unfair labor practices engaged in by Local 52 and the studio employers are:

Local 52's prior approval.

- (b) Local 52 members with hiring authority must first exhaust all possible members before hiring a non-member.
- (C) Local 52's members with hiring authority may not hire nonmember "permits" or "applicants" without the Union's approval.

13

- (d) Defendant's members with hiring authority must exhaust all possible members before hiring nonmembers through the Union.

- (e) Employers covered by Defendant's collective-bargaining agreements may not hire nonmember "permits" or "applicants" without Defendant's prior approval.

- (f) if a member of Defendant is available to work, the member may "bump" a nonmember "permit" or "applicant" off an employer's production because of the nonmembers lack of membership with Defendant.

84. Harker's ULP complaint charged employer studios with assisting Local 52's illegal practices through the actions of studio employer hiring managers, who are members of Local 52, engaging in secret practices that illegally restricted employment opportunities for union nonmembers.

85. For example, on or about October 24, 2021, a union official, in a general membership meeting, threatened to discipline union members with hiring authority who hired nonmembers without the union's prior approval.

86. The Defendant Studios, similarly, through their agent hiring managers, have practices as alleged in the Harker ULP Charge.

87. The Defendant Studios' hiring authority for the union-represented crafts is vested in hiring managers who are Local 52 members and have tacitly agreed to follow the same practices outlined above in paragraph 73.

88. The unwritten hiring rules described in Paragraph 73 that improperly favored Local 52 members further restricted equal hiring opportunities for African Americans and Latinos in the film and television production industry

because of the significantly low representation of African Americans and Latinos among Local 52's membership ranks.

89. To this day, Local 52 continues the same practices found by the NYOMG to be discriminatory against African American and Latino applicants.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(NYSHRL-Disparate Impact Discrimination)

90. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

91. Defendants' policies violated the NYSHRL due to their disparate impact on African American and Latino Africans in the film, television production industry.

### SECOND CAUSE OF ACTION
(NYCHRL-Disparate Impact Discrimination)

92. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

93. Defendants' have violated the NYCHRL because their hiring and promotion policies have a disparate impact on African American and Latino membership in Local 52, and representation in the film and television production industry.

### THIRD CAUSE OF ACTION
(LMRA § 301-Breach of Contract)

94. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

95. Local 52 violated the LMRA § 301 by failing to automatically admit Plaintiff into Local 52 membership after he qualified for automatic vested membership as outlined in the IATSE constitution Article 7, Section 20.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests from this Court a judgment:

a) Declaring that Defendants' policies have a disparate impact on the number of African Americans and Latinos in the film and television industry an order permanently enjoining Local 52 from its current admissions policies, processes and procedures') An award of compensatory damages

b) Granting a permanent injunctive relief is-a-vis Local 52's discriminatory admissions process.

c) An award of punitive damages.

d) An award of reasonable attorneys' fees':

e) All such other and further relief as this Court deems just and proper

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated: New York, New York
September 3, 2024

CHARLES LAW, P.C.

/s/ Fred V. Charles
Fred V. Charles, Esq.
244 Fifth Ave., Suite#2717
New York, NY 100001

Telephone: (646) 494-2662
Email: fcharles@charleslawpc.com

17

Case 1:24-cv-06148-ENV-LKE   Document 1   Filed 09/03/24   Page 19 of 19 PageID #: 19