UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RONALD BISHOP,<br><br>                          Plaintiff,<br><br>    -against-<br><br><br>INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES LOCAL 52, AMAZON MGM STUDIOS, LLC,  CBS STUDIOS, INC., MARVEL STUDIOS LLC, UNIVERSAL TELEVISION, LLC, NETFLIX PRODUCTIONS, LLC, SONY PICTURES TELEVISION, LLC, APPLE STUDIOS, INC., HBO STUDIOS, INC.,<br>                          Defendants. | Civil Action No..: 24-cv-6148 (ENV)(LKE)<br><br>**AMENDED COMPLAINT** |

Plaintiff Ronald Bishop ("Bishop" or "Plaintiff") as and for his complaint of discrimination against the above-captioned defendants, alleges as follows:

**PRELIMINARY STATEMENT**

This action  is a  complaint, pursuant to the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 290 *et seq.* and the New York City Human Rights Law ("NYCHRL") N.Y.C. Admin. Code § 8-101 *et seq.,* for race discrimination against the producers of and labor organization for many of the entertainment industry's most popular and high-profile film and television productions for racial discrimination in hiring and promotion in the film and television production industry. Through this complaint, Mr. Bishop seeks to put a spotlight on his experiences working and attempting to work in this industry, and the general practices that result in the exclusion of qualified African-Americans and Latinos from equal job opportunities in the film and television production industry.  In 2012, the Civil Rights Bureau of the New York State Office of the Attorney General ("NYOAG") launched an investigation into the admissions practices and policies of  the International Alliance of Theatrical Stage Employees ("IATSE") , Local 52, Motion Picture Studios Mechanics ("Local 52") after receiving complaints about

discrimination against qualified African-American and Latino applicants for Local 52 membership. The NYOAG's two-year investigation found that Local 52's admissions policies and practices had a **disparate impact** on qualified African-American and Latino applicants, depriving them of an equal opportunity to join this high-paying and desirable field of work. Today, in 2025, the same practices and policies found by the NYOAG to deprive African-Americans and Latinos of equal job opportunities still exist. The same policies and continue to deprive Mr. Bishop of millions of dollars in compensation and benefits.

## PARTIES

1. Mr. Bishop is an African/American male, and is a resident of Kings County in he State of New York.

2. Defendant International Alliance of Theatrical Stage Employees, Local 52, Motion Picture Studio Mechanics' Union ("Local 52" or "Defendant") is a labor organization, and is the largest New York branch of the International Alliance of Theatrical Stage Employees ("IATSE"), the self-styled *Union Behind Entertainment*.

3. Defendant Marvel Studios, LLC is a motion picture production company, and is a division of the Walt Disney Company, Inc.

4. Defendant CBS Studios, Inc. is a motion picture production company, and is a division of Paramount Global, Inc.

5. Defendant Netflix Productions, LLC is a motion picture production company, and is a division of Netflix, Inc.

6. Defendant Amazon MGM Studios Inc. is a motion picture production company, and is a division of Amazon.com Inc.

7. Defendant Universal Television, LLC is a motion picture production company, and is a division of NBCUniversal, Inc.

8. Defendant HBO Studios, Inc. Is a motion picture production company, and is a division of Warner Bros. Discovery, Inc.

9. Defendant Sony Pictures Television, Inc. is a motion picture production company, and is a division of Sony Group, Inc.

10. Defendant Apple Studios, Inc. is a motion picture production company, and is a division of Apple, Inc.

11. Defendants named in paragraphs 3-10 (collectively, the "Defendant Studios") are Class "A" members of the Alliance of Motion Picture and Television Producers ("AMPTP").

12. AMPTP's Class "A" members, because of their size and influence in the entertainment industry, effectively control more than 80-% of the film and television, production industry hiring in this district.

13. Local 52 is the exclusive collective bargaining representative for the represented craft employees within its jurisdiction, which covers New York, New Jersey, Connecticut, Delaware and Pennsylvania, excluding Pittsburgh and its surrounding 75-mile radius.

Local 52 is divided into departments, or "crafts," by job categories, e.g., electric, property, sound, etc.

2

14. Mr. Bishop has applied for employment with the Defendant Studios, but has been denied any work.

15. The Defendant Studios' hiring policy has a disparate impact on African-American and Latino job applicants.

16. Because of Local 52's admissions and job referral policies, and the Defendant Studios' active participation, qualified African-American and Latino workers are significantly underrepresented in the film and television production jobs in this jurisdiction.

17. Further, the Defendant Studios enjoy generous tax breaks from New York City and New York State to incentivize hiring in the motion picture production industry in the city and state. Therefore, the actions of Local 52 and the Defendant Studios amount to subsidized discrimination in the workplace.

## JURISDICTION AND VENUE

18. ntiff has filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*.

19. Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) as Local 52's principal place of business is located in Queens County and Mr. Bishop is a resident of Kings County, New York.

20. Pursuant to § 8-502(c) of the NYCHRL, Plaintiff will serve a copy of this Complaint on the NYC Commission on Human Rights and the Corporation Counsel of the City of New York.

## FACTUAL ALLEGATIONS

3

21. Mr. Bishop first applied to join Local 52 in late 2012. Mr. Bishop failed his first admissions process, which included a written test and practical skills test, to join the union.

22. At the time, Local 52 informed Mr. Bishop that he did not yet have the requirements for membership, denied his application and kept his application fee and processing fee.

23. Mr. Bishop was then allowed to work for Local 52 represented productions as an "applicant," a status he would hold for 11 years while attempting to qualify for Local 52 membership, despite the fact that by the union's own constitution, Mr. Bishop should have been granted automatic membership in 2018, after five years of being vested in the union's retirement plan.

Mr. Bishop began his career as an applicant electrical technician on television and film sets with production company Vienna's Dream Productions, Inc. on March 24, 2013, where, on that project, he earned 12.7 production hours.

24. A Motion Picture Industry ("MPI") account that tracks production hours worked on each production is created for each worker, whether or not, they are union members

25. The number of production hours an applicant, or any other worker, earns on each production is very important because production hours determine vesting status and benefit levels within the union's health, benefits and retirement plans, the Motion Picture Industry Pension and Health Plan ("MPIPHP").

26. Depriving workers of production hours, for any reason, also deprives them of valuable future benefits and retirement compensation.

4

27. More importantly, vesting into MPIPHP, per the union's constitution, automatically vests an applicant with union membership.

### Local 52 Refuses Mr. Bishop Membership After Vesting

28. Article 7, Section 21 of I.A.T.S.E. Constitution states: "**Any person who has achieved vested status in a Local or national defined benefit pension plan shall immediately be taken into membership without vote.**"

29. Mr. Bishop vested into the MPIPHP defined benefit pension plan in March 2018. Therefore, at that time, Mr. Bishop should have been immediately taken into the membership, or as colloquially stated, made a "cardholder."

30. Local 52 blatantly ignored its own Constitution and failed to offer Mr. Bishop immediate membership into the union.

31. Incredibly, Mr. Bishop was required to go through several more discriminatory admissions cycles, even after being vested into the MPIPHP.

32. For example, in October 2022, Mr. Bishop was required to take a written exam and a practical skills test in order to qualify for Local 52 membership.

33. On Sunday, January 29, 2023, Mr. Bishop was informed by email from the Local 52 HR Director that he had filled the electric department craft examination, which again denied him membership to the union. The email further stated that Mr. Bishop could apply on the still unscheduled next admission cycle, whenever that would take place.

The email did not state on what basis Mr. Bishop failed the examination. The examination, the written portion and the practical skills portion, are administered by an individual in Local 52's electric department, and not by a neutral party.

5

34. During this time, Local 52 was fully aware of the vesting provision in the IATSE Constitution, but chose to ignore this provision in order to exclude unwanted members.

35. There are no checks and balances to determine whether or not the practical skills portion of the examination is being administered in a consistent and equal basis.

36. In fact, there is reason to believe that the examination gatekeepers were administering the exam on a discriminatory basis, passing those individuals who they favored.

37. Mr. Bishop's applicant status, effectively second-class citizenship, allowed him access to employment through union hall referrals but, as explained further below, never on an equal basis with the mostly white cardholding members of Local 52.

38. Over the past three years, Mr. Bishop has worked for Defendant Studios, including but not limited to, CBS Studios, Inc., Netflix Productions, LLC, Universal Television, LLC and Marvel Studios, LLC.

39. Over the past decade, Mr. Bishop gained the experience and skill he allegedly previously lacked, while working on Defendant Studio productions, such as Daredevil and Blue Bloods, however his admission to Local 52 has remained closed.

40. Despite his experience, Mr. Bishop is not treated equally with cardholders while working on Defendant Studio productions.

6

41. For example, as an applicant, Mr. Bishop is restricted from supervisory roles on productions and has looked on while much less experienced White technicians were promoted ahead of him, earning higher pay and status.

42. These restrictions by the Defendant Studios have caused Mr. Bishop financial harm and emotional distress.

43. Local 52's workforce is separated into several different categories, or statuses, correlated to the individual's membership status. At the top of the foodchain are the actual members of Local 52 or "cardholders." Next, there are the "applicants," individuals who have applied for Local 52 membership, but, for varying reasons, have been denied membership. The next category of workers are the "permits," individuals who have yet to apply for membership to Local 52, or have refused to apply to the union.

44. Cardholders are Local 52's first class citizens. Many of the advantages, privileges and benefits of being a cardholder, as opposed to the lesser union statuses, blatantly violate unfair labor practices laws pursuant to the National Labor Relations Act ("NLRA").

45. Cardholders are the first hired and last fired on productions, and are able to take days off from productions with the right to return to work. Cardholders can bump, or replace, non-cardholders from productions when cardholders are in need of work.

46. Due to Local 52's racially discriminatory admissions policies, cardholders are disproportionately White compared to the labor pool in the metropolitan New York City area.

7

**New York Attorney General Finds Racially Discriminatory Admissions Policies**

47. In August 2012, after receiving complaints, the Office of the Attorney General of the State of New York ("NYOAG"), Civil Rights Bureau, opened an investigation into Local 52's membership admissions policies to determine whether the union discriminated against qualified African-American and Latino applicants by failing to provide equal opportunity for admission and employment.

48. The NYOAG's investigation lasted for approximately two years, from August 2012 to September 2014. The NYOAG investigation was thorough: it included reviewing Local 52's internal documents; taking sworn testimony of Local 52 Executive Board members; data analyses; and, conducting interviews with complainants.

49. The NYOAG investigation found **significant disparities** between, on the one hand, lack of African-American and Latino representation in the union membership, and on the other hand, the representation of these minority groups in the metropolitan area labor pool.

50. The NYOAG investigation concluded that Local 52's discriminatory admissions practices had a **disparate impact** on African-American and Latino applicants.

51. The NYOAG also found that union members obtained significantly more film and television jobs, and on a more consistent basis, than applicants.

52. The conditions described above in paragraphs 49 and 50 exist today where African-American and Latino representation in the Local 52 membership

8

ranks remains significantly low compared to these groups' representation in the local labor pool.

53. The NYOAG found several causes for the disparities. The NYOAG found that Local 52's admissions policies relied on nepotism, the inconsistent application of rules to qualify for membership, and the discriminatory content and administration of craft examinations.

54. The NYOAG concluded that, because of the already significant underrepresentation of African-Americans and Latinos, Local 52's use of nepotism (favoring family and friends) to admit new members caused these minority groups to be excluded from industry jobs.

55. Each admissions cycle, Local 52 administers examinations, consisting of a written test and a practical skills demonstration, to union membership hopefuls.

56. The subjective nature of the content and administration of the craft examinations, cited by the NYOAG as discriminatory, continues to the present. Applicants with years of experience and training are consistently failed on craft examinations, while friends and family of Local 52 members with much less experience and training are passed, or are made members through other means.

Mr. Bishop's applicant status is a perfect example of the union's inequitable application of its membership rules. Mr. Bishop qualified for automatic union membership in March 2018. However, the union did not decide to grant the status, and instead waited six years in 2024 to finally invite him to union membership.

9

On September 24 2014, Local 52 and the NYOAG entered into a settlement agreement, called an Assurance of Discontinuance ("AOD"), to resolve the NYOAG's potential claims against the union for race discrimination.

57. Local 52 agreed to pay a monetary penalty of $475,000, and agreed to a set of structural remedies aimed at ensuring equal opportunity for union membership for all.

58. The structural remedies included changes to Local 52's application procedures that had a disparate impact on African-American and Latino applicants.

59. Local 52 agreed to ensure that the design of its application procedures allowed for applicants to be evaluated on their qualifications and abilities in a consistent and non-discriminatory manner that does not favor the family and friends of Local 52 members.

60. On September 6, 2016, the NYOAG and Local 52 signed an Addendum, or extension, to the AOD, which was set to expire on June 20, 2017.

61. The Addendum stipulated continued monitoring and structural changes to the union's admissions process in order to ensure equal opportunity for African-Americans and Latinos.

62. The fatal flaw of the NYOAG's settlement and extension with Local 52 is that the monitoring and many of the necessary structural changes were temporary, and limited in scope. Local 52 has presently reverted to the same old practices that resulted in the investigation in the first place.

63. To this day, Local 52 continues the same policies and practices found by the NYOAG to be discriminatory against African-American and Latino applicants.

64. Further, the NYOAG failed to address the role of the employers, including the Defendant Studios, in perpetuating discriminatory policies against African-Americans and Latinos.

**Harker NLRB Complaints Against Local 52**

65. On January 10, 2022, James Harker ("Harker"), a Local 52 member, filed with the National Labor Relations Board ("NLRB") a Charge of Unfair Labor Practices ("ULP") against Local 52 alleging, *inter alia,* that the union, and certain film studio employers, that are also AMPTP members and signatories of the Local 52 CBA, discriminated against applicants, as opposed to Local 52 members, in its hiring practices.

66. The specific unfair labor practices engaged in by Local 52 and the studio employers are:

Local 52's prior approval;

- (b) Local 52 members with hiring authority must first exhaust all possible members before hiring a non-member;
- (C) Local 52's members with hiring authority may not hire nonmember "permits" or "applicants" without the Union's approval;
- (d) Defendant's members with hiring authority must exhaust all possible members before hiring nonmembers through the Union;

11

- (e) Employers covered by Defendant's collective-bargaining agreements may not hire nonmember "permits" or "applicants" without Defendant's prior approval;

- (f) if a member of Defendant is available to work, the member may "bump" a nonmember "permit" or "applicant" off an employer's production because of the nonmembers lack of membership with Defendant.

67. Harker's ULP complaint charged employer studios with assisting Local 52's illegal practices through the actions of studio employer hiring managers, who are members of Local 52, engaging in secret practices that illegally restricted employment opportunities for union nonmembers.

68. For example, on or about October 24, 2021, a union official, in a general membership meeting, threatened to discipline union members with hiring authority who hired nonmembers without the union's prior approval.

69. The Defendant Studios, similarly, through their agent hiring managers, have practices as alleged in the Harker ULP Charge.

70. The Defendant Studios' hiring authority for the union-represented crafts is vested in hiring managers who are Local 52 members, and have tacitly agreed to follow the same practices outlined above in paragraph 73.

71. The unwritten hiring rules described in Paragraph 73 that improperly favored Local 52 members further restricted equal hiring opportunities for African-Americans and Latinos in the film and television production industry because of the significantly low representation of African-Americans and Latinos among Local 52's membership ranks.

72. To this day, Local 52 continues the same practices found by the NYOMG to be discriminatory against African-American and Latino applicants.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(NYSHRL-Disparate Impact Discrimination)

73. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

74. Defendants policies violated the NYSHRL due to their disparate impact on African-American and Latino Africans in the film, television production industry.

### SECOND CAUSE OF ACTION
(NYCHRL-Disparate Impact Discrimination)

75. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

76. Defendants' have violated the NYCHRL because their hiring and promotion policies have a disparate impact on African-American and Latino membership in Local 52, and representation in the film and television production industry.

### THIRD CAUSE OF ACTION
(Aiding and Abetting Against Defendant Studios)

77. Plaintiff repeats and realleges the foregoing as if fully set forth herein.

13

78. The Defendant Studios' hiring policies and practices have a disparate impact on the mumber of qualified African-American and Latinos working in the film and television production industry within this district.

79. The Defendant Studios' practice of hiring either through Local 52 has had a disparate impact on the number of qualified African-Americans and Latinos working in the film and television production industry.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests from this Court a judgment:

a) Declaring that Local 52's admissionse policies have a disparate impact on the number of qualified African-American and Latino applicants admitted into Local 52;

b) Granting a permanent injunctive relief vis-a-vis Local 52's admissions policies.

c) An award of compensatory damages for violations of the NYSHRL and NYCHRL;

d) An award of punitive damages for violations of the NYSHRL and NYCHRL;

e) An award of reasonable attorneys' fees':

f) All such other and further relief as this Court deems just and proper

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated: New York, New York
      April 30, 2025

                                      CHARLES LAW, P.C.

                                      /s/ Fred V. charles
                                      Fred V. Charles, Esq.

244 Fifth Ave., Suite#2717
New York, NY 100001
Telephone: (646) 494-2662
Email: fcharles@charleslawpc.com

15